**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Melvin D Richardson, | No. CV-16-01663-PHX-DLR |
| Plaintiff, | **ORDER** |
| v. | |
| Day & Zimmerman Incorporated, | |
| Defendant. | |

Plaintiff Melvin Richardson, a black man, accuses his former employer, Defendant Day & Zimmerman Incorporated ("DZ"), of treating him differently and terminating him because of his race.[1] At issue is DZ's motion for summary judgment, which is fully briefed. (Docs. 41, 49, 51.) Neither party requested oral argument. For the following reasons, the motion is granted.

**I. Background**

Richardson's claims arise under Title VII of the Civil Rights Act of 1964 and

---

[1] Richardson was employed by non-party the Atlantic Group, Inc. ("DZ Atlantic"), which in turned is owned by Day & Zimmerman International, Inc. DZ is a subsidiary of the Day & Zimmerman Group, Inc. DZ Atlantic supplies maintenance services to the power industry and provides temporary workers to nuclear power stations around the country. During the relevant time period, DZ Atlantic provided such services to the Palo Verde Nuclear Generating Station under a contract with Arizona Public Services Company. Richardson worked as a superintendent at the Palo Verde Nuclear Generation Station pursuant to this contract. Though DZ does not concede that it may be conflated with DZ Atlantic, it nonetheless refers to itself as Richardson's employer for purposes of summary judgment only. The Court will do the same.

Arizona's state law counterpart, the Arizona Civil Rights Act ("ACRA"), both of which prohibit racial discrimination in employment. *See* 42 U.S.C. § 2000e-2(a)(1); A.R.S. § 41-1463(B).[2] To properly evaluate these claims, it is important to understand the limits of the relevant statutes. Neither Title VII nor the ACRA "require the employer to have good cause for its decisions. The employer may [take action against] an employee for a good reason, a bad reason, or a reason based on erroneous facts, or for no reason at all, so long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'n*, 738 F.3d 1181, 1187 (11th Cir. 1984). The relevant question is not whether the employer's decision was prudent, but instead whether the employer terminated the employee because of his race "or for some other legitimate, non-discriminatory reason—no matter how ill-advised or unprincipled it may be." *Sheville v. Am. W. Airlines, Inc.*, No. CV05-02790-PHX-NVW, 2006 WL 3497787, at *5 (D. Ariz. Dec. 4, 2006).

When viewed through this lens, the facts material to the disposition of this case are not genuinely disputed. Indeed, where Richardson purports to dispute DZ's separate statement of facts, he actually is challenging the wisdom or correctness of DZ's disciplinary decision. (*See, e.g.*, Doc. 50 ¶¶ 51-59, 65.) Because "it is not the role of [the] court to sit as a 'super-personnel department' to second-guess the wisdom of a business's personnel decisions," *Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 957 (8th Cir. 2001), these disputes are not material. With this understanding, the Court will provide an overview of the undisputed facts material to this decision.

During the relevant time period, Richardson worked as a superintendent at the Palo Verde Nuclear Generating Station, responsible for overseeing a group of workers known as SK305, which was comprised mostly of electricians and charged with performing security upgrades. Richardson's unit had between thirty and forty workers,

---

[2] Richardson accuses DZ of violating the Arizona Employment Protection Act, which prohibits employers from terminating an employee "in violation of a statute of this state." A.R.S. § 23-1501(A)(3)(b). Though his complaint does not specify the precise Arizona statute he believes his termination violated, it is apparent from the nature of his allegations and the summary judgment briefing that Richardson's state law claim implicates the ACRA's prohibition of racial discrimination in employment.

including three general foremen—Marcelo Vargas, Fred Lane, and Cesar Villa—who reported directly to Richardson. Below the general foremen were six or seven foremen who worked directly with the electricians in the unit.

In 2015, SK305 was involved in a series of safety-related incidents. First, in June the unit was scheduled to perform work that required electrical power to be cut to a security door after certain tests on the door had been completed. While the workers were waiting to cut power to the door, they were informed via radio that the tests had not been completed. The workers misheard the message, however, and prematurely cut power to the door, which delayed the work that was scheduled to be performed that day. Next, in July SK305 was assigned to work on a project that involved enlarging a hole in a metal plate for wires to pass through. The employees involved in the project did not follow safety protocols and, as a result, one was injured. The following month, the unit was involved in another incident concerning the improper use of tools during a similar assignment.[3] Finally, in August SK305 employees did not follow proper protocols while performing work on a door used to contain radiation. Consequently, the door was inoperable for several days, requiring the facility to station a security guard at the door until the problem could be resolved.[4]

Following these incidents, DZ opened an investigation into SK305. As part of that investigation, DZ interviewed twenty-four SK305 employees and generated an investigation report. The report stated that surveys and interviews conducted during the investigation "provide evidence that there are significant on-going [work culture] issues in SK305 and the problematic focal point is the two named General Foreman (Vargas & Lane) and the SK305 Superintendent (Richardson)." For example, 37.5% of those surveyed reported that they did not believe DZ leadership would positively support a stop

---

[3] Richardson disputes DZ's characterization of the incident as a "near miss"—meaning an incident that could have caused an accident or injury—but does dispute that improper tool usage occurred. (Doc. 42 ¶¶ 38-41; Doc. 50 ¶¶ 38-41.)

[4] Richardson squabbles over the details of how the incident unfolded and who was to blame, but does not genuinely dispute that the incident occurred or that the door was inoperable for several days as a result. (Doc. 42 ¶¶ 43-44, 46; Doc. 50 ¶¶ 43-44, 46.)

in work for safety reasons, 42% reported witnessing or experiencing a lack of support when a safety concern was identified, and 62.5% reported witnessing inappropriate behavior by DZ leadership, including general foremen being condescending, or yelling or cursing at them, and Richardson "witness[ing] inappropriate behaviors and [doing] nothing about it." After being presented with these results, DZ terminated Richardson and two general foremen, Lane and Vargas, neither of whom are black.

Richardson later brought this action, alleging that DZ terminated him because of his race. DZ now moves for summary judgment on all claims.

**II. Summary Judgment Standard**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and, viewing those facts in a light most favorable to the nonmoving party, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. The burden then shifts to the non-movant to establish the existence of a genuine and material factual dispute. *Id*. at 324. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and instead "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation and citation omitted).

Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248). Conclusory allegations, unsupported by factual material, are insufficient to defeat summary judgment. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989). If the nonmoving party's opposition fails to cite specifically to evidentiary materials, the court is not required to either search the entire record for evidence establishing a genuine issue of material fact or obtain the missing materials. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028–29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417-18 (9th Cir. 1988).

**III. Analysis**

The Court evaluates racial discrimination in employment claims using the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), under which a plaintiff first must establish a *prima facie* case of discrimination by showing that he: (1) is a member of a protected class, (2) is qualified for his job, (3) suffered an adverse employment action, and (4) was treated less favorably than other similarly situated employees outside his protected class. *See also Hidgon v. Evergreen Int'l Airlines, Inc.*, 673 P.2d 907, 909 at n.3 (Ariz. 1983) ("The [ACRA] is modeled after and generally identical to the federal statute in the area . . . . Accordingly, we find federal Title VII case law persuasive in the interpretation of our Civil Rights Act."). If a plaintiff makes this threshold showing, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1123-24 (9th Cir. 2000). If the employer does so, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is a pretext for discrimination, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). A plaintiff's evidence on this point "must be both specific and substantial to overcome the

legitimate reasons put forth by," the employer. *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 659 (9th Cir. 2002).

Here, there is no dispute that Richardson is a member of a protected class and that his termination constitutes an adverse employment action. DZ argues, however, that Richardson cannot establish a *prima facie* case of racial discrimination because he cannot produce evidence that similarly situated employees outside his protected class were treated more favorably than him. DZ also argues that Richardson cannot produce specific and substantial evidence showing that he was terminated on account of his race, rather than as a result of DZ's internal investigation into SK305's safety lapses. The Court agrees on both points.

### A. Richardson's *Prima Facie* Case is Deficient

Richardson cannot establish a prima facie case of racial discrimination because he has not identified similarly situated employees who were treated more favorably than him. His discharge is the only adverse employment action for which there is admissible evidence, and it is undisputed that DZ terminated the two other supervisory employees in Richardson's unit, who were not black, as a result of the internal investigation into SK305's safety lapses. Richardson "cannot be heard to advance a colorable claim of disparate treatment when [DZ] treated . . . similarly situated employee[s] outside of [his] protected class . . . no more favorably than it treated him." *Sheville*, 2006 WL 3497787, at *5.

Although Richardson's complaint included allegations of other discrimination not related to his termination, he has not supported them with sufficient evidence to survive summary judgment for several reasons. First, Richardson testified that he felt his white counterparts "Thomas Forde and Charles Whitehead" were getting "more of what they needed" than he was getting. (Doc. 42-1 at 55-56.) But Forde and Whitehead are not valid comparators. "In order to show that the employees allegedly receiving more favorable treatment are similarly situated . . ., the individual[] seeking relief must demonstrate, at the least, that [he is] similarly situated to those employees in all material

respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (internal quotations and citations omitted). "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003). Here, neither Forde nor Whitehead held similar positions as Richardson; Forde was a project superintendent and Whitehead managed a scaffold group under a different department. (*Id.* at 111-12.) Nor is there any evidence that Forde and Whitehead displayed similar conduct as Richardson.

Second, when asked during his deposition to elaborate on his allegations of disparate treatment, Richardson was unable to articulate any specific basis for his claims. For example, Richardson was asked point blank "What do you believe Tom Forde was receiving that you weren't?" (*Id.* at 56.) His response was vague and largely indecipherable:

> The workers that come from Tom Forde over to work for me temporarily were going back to him, telling him things that they felt were wrong. Some of those things were wrong, and a lot of those things were the way we did business over there, not anything in error. Some of it was because of a lack of understanding, and some of it was because workers didn't want to work as much as we worked. But I worked 12 months a year, constantly. It wasn't the up and down so much as the outage work. The reason or that was I would project out for new mods, and I would participate with the "own it, see it, do it" policy that APS had. In other words, if you see them having a need here, be a part of the resolution or the solution. And so I ended up getting more work from them than I could handle, per se. But if that was the case, as far as me being under APS, they said "Okay. Well, we need you to do it. What do you need?" If I say more equipment, I've got it. If I said another supervisor, I've got it. But then this transition thing on the D&Z, it didn't happen that way, but the work kept piling.

(*Id.* at 56-57.) Richardson was asked again "So what was it, then, that you felt that Tom Forde received that you didn't receive?" (*Id.* at 57.) He responded: "As I said, if his workers would go back and tell him information, they wouldn't necessarily tell me, and that information consisted of some of it was the way we did work in a multiple work group." (*Id.*) Richardson was asked "is there anything else you felt that Tom Forde received that you did not?" (*Id.* at 58.) He replied:

> Any personal complaints, anything—you know, his workers felt closer to him because they were always with him. They just came over to work with me. So, you know, just in talking with him, I mean, they initially told him, you know, that they were unhappy or whatever the problem was before it would get to me.

(*Id.*) Likewise, when asked to explain what Whitehead received that he did not, Richardson was unable to recall any specific instances of differential treatment. (*Id.* at 58-60.)

Richardson attempts to manufacture a factual dispute regarding his allegations of differential treatment by submitting a self-serving, post-discovery affidavit in which he elaborates on his claims. (Doc. 50-1 at 1-15.)[5] For example, Richardson claims in his affidavit (without supporting evidence beyond his own self-serving statements) that unidentified "[w]hite males in the same position were given the authority to hire the staff needed and make those decisions but I was not." (Doc. 50-1 at 12.) Likewise (and again without supporting evidence beyond is own self-serving statements), Richardson claims in his affidavit that he was paid on an hourly basis, whereas unknown other "supervisors" were paid a salary. (*Id.*) Even assuming the truth of these statements, the fact that Richardson cannot identify any specific employees who received more favorable treatment is fatal to his claims.

But the Court does not accept Richardson's affidavit because the information contained therein contradicts his earlier deposition testimony. As previously explained,

---

[5] The manner in which Richardson's affidavit was presented rendered it difficult to navigate and largely unhelpful. The affidavit is not organized into separately numbered paragraphs. Rather, it is presented as a disorganized, fifteen-page narrative that weaves together a host of irrelevant information, including unnecessary critiques of the competence of his supervisors. Moreover, Richardson's response brief and controverting statement of facts cite to the affidavit generally, without pin cites to specific pages. As a result, the Court was required to review the entire fifteen pages in search of responsive information anytime the document was cited. "As the Seventh Circuit observed in its now familiar maxim, 'judges are not like pigs, hunting for truffles buried in briefs.'" *Independent Towers of Wash v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). This presentation, combined with Richardson's persistent invitation for the Court to re-examine the wisdom of DZ's disciplinary decision, made the Court's review of the pending motion far more difficult than it should have been given the dearth of evidence that DZ's treatment of Richardson was racially motivated.

Richardson was asked directly—multiple times—to specify how he believed he was treated differently than other employees, and to identify those employees to whom he was comparing himself. His answers were devoid of responsive information. Richardson cannot now sandbag DZ with a sham affidavit after refusing to provide this information when asked during his deposition. Indeed, courts "have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his . . . own previous sworn statement." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *see also Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("[A] party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.")

For these reasons, Richardson cannot establish a *prima facie* case of racial discrimination under federal or Arizona state law.

### B. DZ's Reason for Terminating Richardson is Not Pretextual

Assuming, *arguendo*, that Richardson has established a *prima facie* case of racial discrimination, summary judgment is warranted because DZ has articulated a legitimate, non-discriminatory reason for terminating him, and Richardson has not proffered specific and substantial evidence of pretext. Instead, Richardson quarrels with the correctness and methodology of DZ's internal investigative fact-finding. But the Court "can assume for purposes of this [order] that the . . . employees interviewed by [DZ] were lying through their teeth. The [relevant] inquiry . . . is limited to whether [DZ] believed that" Richardson was in part responsible for the safety lapses "and if so, whether this belief was the reason behind [Richardson's] discharge." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). Here, though Richardson might believe that his termination was unfair or unwarranted, there is no genuine dispute that DZ terminated him because the internal investigation into SK305's safety lapses concluded, rightly or wrongly, that he and two other employees outside his protected class were to blame.

### IV. Conclusion

Though Richardson might disagree with the wisdom of DZ's disciplinary action or

with the accuracy of its internal investigation results, he has proffered no evidence that would permit a trier of fact to conclude that DZ terminated him because he is black. Nor may Richardson manufacture a factual dispute about other alleged discriminatory treatment using a self-serving, post-discovery affidavit that contradicts his sworn deposition testimony and otherwise fails to identify specific and valid comparators. The Court therefore concludes that the facts material to this case are not genuine disputed, and that those facts, even when viewed in the light most favorably to Richardson, do not support his racial discrimination claims. Accordingly,

**IT IS ORDERED** that Defendant Day & Zimmerman Incorporated's motion for summary judgment (Doc. 41) is **GRANTED**. The Clerk shall enter judgment accordingly and terminate this case.

Dated this 27th day of October, 2017.

Douglas L. Rayes
United States District Judge